Thank you, Your Honor. I'll introduce myself again. I'm Dan Bonnett from Phoenix, Arizona, and I represent the Plaintiff Appellant, Mr. Charles Gribben. I was reviewing several times over our brief and the six issues that we have raised for Your Honors to consider on this appeal. And it seems to me that they lend themselves to being grouped in categories. The substantive legal issue, I think, is issue number one that's found on page one of our brief. There's what I would allude to as the procedural issue. That is issue number two that talks about whether the plaintiff adequately raised the 100 percent fitness for duty and forced medical leave issues. And then the remaining four issues, I would categorize those as evidentiary or evidentiary-related type of issues, along with the overlap that the punitive damage instruction has as well. I wonder if I could direct your attention. It's Mr. Bonnett, right? Bonnett, yes, Your Honor. Bonnett, right? Yes. Is that on the first part or the last part? I used to have a schoolteacher that said the emphasis is on the second syllable. So it is on the second syllable then, huh? Correct. Okay, Bonnett, okay. That has to do with the issue of whether or not Mr. Gribben was disabled. Correct. I know you cite Head for the proposition that there need be no comparative evidence in every case. But in this case, you're really talking about a person whose doctor said it was okay to work. You're talking about what anybody who's ever lived in or visited Arizona for any period of time knows is a brutal sun during certain times of the year, the record showing that, at best, whether in or out of an air-conditioned cab, he's out in the sun a good part of the time the rest of the time. And it bothers him. But doesn't that bother everybody who lives in Arizona? Well, it bothers people to varying degrees, Your Honor. And I think, as we pointed out in our brief, it's a matter of personal choice for most people. That I play golf in the summer. It's not my favorite time of the year to play golf, but I manage to play. I don't cease that activity. But that's a matter of personal choice. In this instance, Mr. Gribben, it's his heart condition that is the issue that I think. . . Well, provided he has these intermittent periods of time to cool down, and that he has to have the ability to cool down, and then the doctor described what could happen. And Mr. Gribben went at great length in his deposition to describe what happens when he doesn't do that. And that, frankly, I think is what this case turns on, is those conditions, those symptoms, those things that occur, that we read Head to say is sufficient at the summary judgment stage to create genuine issues of material fact. Why do you think that Head is dispositive of this comparable evidence rule? Well, unless I'm misreading what it plainly says, it seems to say that there's no need to have comparable evidence or there's no need to have. . . In this case, right? In every case. Aren't there some exceptions? In this instance, what we had in this case was sufficient evidence that we think does create genuine issues of material fact. For example, if I may direct the Court's attention to various excerpts of the record, Mr. Gribben said, quote, My breathing is pretty much never just normal, unquote. Quote, I do go through periods all day long where I never catch my breath. He makes other statements about his breathing not being normal, that it's labored, that it happens all of the time. Complaints about heat cause him to become dizzy, to experience. . . And I appreciate that. I guess what I'm struggling with, and I'm hoping you can help me, is how he is different from other people. This Act was enacted to help people who were disabled. And there are three prongs the defendants have conceded. The first two, you're really talking about whether, in fact, he is unable to. . . There's substantial limits. And whether that means unable to perform or significantly restricted as the condition, manner, or duration under which an individual can perform as compared to the average person. Now, in this particular case, the gravamen, as I understand it, of this complaint is it's really hot out there. I mean, it is really hot, and it's very uncomfortable. And your client is in the cab at best for five minutes, and the rest of the time he's out there, and it's really, really uncomfortable. But isn't it relevant? Isn't it, indeed, required to see whether, compared to the average person, he's disabled, to see what the impact is on other people who don't have your client's heart condition? Well, I would respectfully like to refine one comment, Your Honor, if I may. Okay, fine. I want to learn. I think it is a factual dispute how much time Mr. Gribben spends in his cab. I think that is a factual, factually contested issue. He said that he was in his cab more than half of his time. I think the defendants argued that he was in and out of his cab a great deal more than that. But there is certainly evidence in the record from which a jury could find that Mr. Gribben is in his air-conditioned cab a great deal more of the time than he's out of his air-conditioned cab. It's what happens to him when he's out of his cab because of his heart condition that we're claiming is the major life activity and the substantial limitation. We have not argued, and I would not ask this Court to find, that being in the extreme heat is, interference with being in the extreme heat is a major life activity. What we're saying here is that his heart condition and the effect that it has on him when he is out in the heat is what the real problem is here. And Mr. Gribben, I think, has gone to some degree, as Mrs. Gribben did, and as Dr. Moon said even, that people, he would expect that people with this heart condition would experience the same symptomology. So I think an answer, and I sort of danced around your question, Your Honor, but to get to the answer, I think that's precisely what Justice O'Connor was talking about in Toyota Manufacturing v. Williams. This is an individualized assessment. And in order to make that individualized assessment, we have to back away and look at the totality of Mr. Gribben's circumstances here. And if we do that, and I think as this Court correctly said in Head, I think you can look on those circumstances, did Mr. Gribben present enough information, did he present enough about how this affects him because of his heart condition, not because it just happens to be hot in Phoenix in the summertime, but because of his heart condition, that a jury could reasonably conclude that he is substantially limited due to his cardiomyopathy. And I appreciate your point. I still am struggling with the CFR site, though, that talks about 29 CFR 1630.2J1 that talks about that substantial limits means unable to perform or significantly restricted as to the condition, manner, or duration under which an individual can perform as compared to the average person. Now, it seems to me that's a comparative requirement. I don't read Head necessarily the same way that you do. And we take as a given in this case your client has this heart issue. UPS required him to get a more complete examination. I know you're not happy with that either, but to make certain that he was able to work. But he did work. He was out there. He continued to work, whether it was every half an hour or whatever. The fact is he was doing the work. His physician knew he was doing the work, said he was okay to do the work. And the problem seemed to be with the heat. And so how do you get the comparison, if you will, of your client's condition versus the average person if you don't have testimony as to what the average person would experience in, say, 115-degree heat? Don't people hyperventilate? Sometimes people have heart problems and angina and other things when they're average people. I would think that most of the general population does not have loss of consciousness or difficulty thinking or losing concentration or stumbling over the ottoman or falling down or losing consciousness. Well, let's say that you're correct. In order to show that as a matter of law, don't you have to show that the average person doesn't have those things happen in that condition? Well, I think the jury can find, based on what was presented and what we would argue at the trial stage and what we would argue here, that I think it's common knowledge that people don't have those problems. I think just everyday experiences that we draw upon, when we walk around in Phoenix, we don't see people falling down on the street. We don't see people on the road. Well, most of them don't stay out and work moving big vehicles around in the middle of the heat, in the middle of the day, do they? I'm sorry, Your Honor. Most of them don't move big vehicles and trucks out in the heat in the middle of the day. I have seen a fair number, but I would concede that most do not do that. That's correct. There are a lot of people who work outside all summer long. I'm sorry, Your Honor. There are a lot of people who work outside all summer long. That's correct. They do. And those people, I think, as I said earlier, make the choice. Now, the question is, do you have to have any evidence of that, I guess, in the record? And Head seems to say no. Was this regulation ñ Head doesn't mention the regulation at all. No, it does not, Your Honor. Neither does the district court's decision granting summary judgment. Although we raised Head in our opposition, it makes no mention of Head. In fact, it relied on a Tenth Circuit case that was decided prior to the Toyota case. And we're not sure if there was some diversion, the Court's thinking focused on this specific part of the regulation as opposed to what we think Head was intending to say. And it seems very clear to us that what Head was saying is it isn't necessary. But we think we have some comparative here with Dr. Moon's statement, that most people who have this type of a condition, he would expect to have these types of symptoms. So we believe that retreating from Head here would be inconsistent with what Justice O'Connor was suggesting that we do and have an individualized assessment here in looking at this. So Head says you don't need comparative or medical evidence and never says what comparative evidence is, but I guess it must ñ I guess it can't be anything but the sort of thing we're talking about. Well, I would hope the Court would see it that way. It's very truncated. And one last comment before I would like to talk a few minutes about the other issues that are raised, the procedural issues and the evidentiary issues. The regulation that Your Honor cited talks about two ways to go about finding that there's been a substantial limitation, subsection little i and subsection double little i. And I believe Your Honor was reading from subsection double little i. The first one, being unable to perform a major life activity that the average person in the general population can perform. I suppose that that begs the question, does breathing mean you have to cease breathing in order to have that type of an impairment that is ñ or substantial limitation that's being referenced in the first one? And I would suggest, of course it doesn't. It makes no sense, because stop breathing, then obviously the consequences are self-explanatory. No, it's something like walking. You might be unable to walk. But labored breathing in this instance, we would say, as described by the plaintiff, the labored breathing and the problems that that produced would more properly fall within what might be expected in that particular section. With regard to the ñ if I may move to the procedural issues and the evidentiary issues, and I'd be happy to answer any other questions the Court may have. On the retaliation claim, it's our contention that it was adequately raised in the pleadings, given the liberal notice provisions that exist under the Federal Rule of Law, we feel that the references in the complaint to the 100 percent fitness for duty requirement and the forced medical leave issues were adequately raised. And for several reasons. One, that had there been no reference to those things in Mr. Gribben's charge that he filed with the EEOC, we would be in a different position. But if the Court would refer to the record where Mr. Gribben's EEOC charge exists at 36, a copy of the charge clearly shows that as early as November of 2002, he was claiming the fact that once he made the request for accommodation, he was walked off the job and not allowed to return until he was 100 percent fit for duty and could demonstrate that fact. And secondly, the EEOC letter of determination that eventually followed and predated Mr. Gribben's termination also makes reference to those factors as well. Each of those documents existed prior to the complaint being filed. The defendant was aware of those things. They were expressly referenced in the complaint. And we believe that they are subsumed in the allegations that were made by Mr. Gribben that his request for accommodations was not properly processed and that the defendant failed to engage in the interactive process. So it was raised in that context. In response to the summary judgment, as we pointed out in our brief, we believe we also adequately addressed those issues in response to the defendant's assertions in what the defendant raised. There was no specific mention made by UPS in its motion for summary judgment. And in fact, we think the district court's position that the entire complaint being challenged at summary judgment without making specific reference to what we think was part of Mr. Gribben's retaliation claim unfairly shifted the burden to Mr. Gribben, as we pointed out in our reply brief, to respond to something that had not been raised when we believe that the facts that were put forth clearly shows that he was asserting those things as part of his overall complaint against the defendant in the first instance. With regard to the evidentiary issues, if I may, and I would like to talk primarily about the testimony that we attempted to present through Mr. Rahill, who was an investigator at the EEOC who met with Steve Stevens of UPS, placed Mr. Stevens under oath with his counsel present, took a statement from Mr. Stevens in which Mr. Stevens said that Jerry Dalzell, the person who made the decision to terminate Mr. Gribben, had said that Denise Ecker, the human resources individual, had told Mr. Dalzell about Mr. Gribben's EEOC determination letter and was aware of that when the decision was made to terminate Mr. Gribben in March of 2004. We believe that that evidence should be presented. Mr. Bonet, I think you wanted to save three minutes, so. Oh, I did, Your Honor, yes. If you want to, we'll turn it over then to Mr. Barton for his presentation, and we'll look forward to hearing from you. Thank you very much. Good day, Your Honors. It's a beautiful day here in San Francisco. In fact, if we were to go out for a walk today with Mr. Gribben on a day like today where the temperature is only about 70 degrees, we would have no indication whatsoever that he were disabled. In fact, if we were to go golfing with him or even running with him, we would have no indication that he was disabled if it were a day like today. Mr. Gribben in his deposition testimony said he could do all those things, provided the temperature isn't above 90 degrees and provided he doesn't do them for longer than 20 minutes at a time continuously. It's only then that his breathing becomes labored, he has chest pains at times, he has difficulty thinking at times. Only under those conditions does his alleged disability become limiting. And that's the rub in this case. The regulations that define a disability and laws that have been developed to define what a disability is say that a disability must be substantially limiting. That term substantially is critical. It comes right out of the statutory text and it has been applied by every court that's ever considered a disability claim. In fact, in the Toyota Manufacturing v. Williams case, the United States Supreme Court said that these terms need to be interpreted strictly to create a demanding standard for qualifying as a disabled. It's not simply everybody who has difficulty working in the heat who can qualify for protection under the Americans with Disabilities Act, and that principle has become clear throughout our jurisprudence. Mr. Barton, I'd like to follow up with you the same line of questioning I had with Mr. Bonet. I'm going to read just a very brief little point here from Head. It says, We hold that the Ninth Circuit precedent does not require comparative or medical evidence to establish a genuine issue of material fact regarding the impairment of a major life activity at the summary judgment stage. Rather, our precedent supports the principle that a plaintiff's testimony may suffice to establish a genuine issue of material fact. Why hasn't that been done in this case by virtue of Mr. Griffin's testimony? Mr. Griffin didn't provide any testimony about what the average person in the general population can do. He didn't provide any basis for the judge to analyze or compare his limitations with those of the average person in society. Those regulations set out a two-part test, if you will, for determining if there's a disability. One, you're unable to perform the major life activity at issue. Or two, you're substantially limited as compared to, and that's important language, as compared to the average person in society. What does Head mean then? Because Head wasn't wholly unable to perform anything. His testimony was that he was limited in the way he could do it. Actually, if you look carefully at the facts of Head, Your Honor, Head does not stand for the proposition that it is error to require or to produce or insist upon comparative evidence. Head suffered from bipolar disorder. And if you look at the facts, the court focused on how significantly that disorder impacted his ability. And I take these quotations from the record and from the case in Head. They pointed out that his bipolar disorder made it impossible for him to sleep more than three to five hours a night. And they said that's different than the average person who sleeps between seven to nine. Head himself testified to that, that previous to the onset of his disorder, he could sleep seven to nine hours. After the onset of the disorder, he could only sleep a maximum of five hours a night. And sometimes he couldn't sleep at all. So he fit, if you will, into this Category 1 of cases where he could not sleep like the average person could. Two, it made it very difficult for him to interact with others. And the court pointed out that in Head's testimony he said, most of the time or in many cases I can't even leave the house or talk on the phone. So most of the time Head could not interact with others. He was precluded from this basic concept, this basic ability to interact with others. So do I understand your point in response to Judge Canby's question, that you distinguish Head by saying that what the court meant was that the allegedly disabled person can, by his or her own testimony, provide comparative evidence and at the summary judgment stage that is sufficient. Particularly citing the evidence in Head, where you had a person who had a Head problem and nobody else really knew it at that point, but it was kind of commonsensical. Is that your construction of Head? Absolutely correct. Head, you know, that's what Head means, though. It said it in a very strange way. It said you don't need comparative evidence. Well, certainly as the court understands, occasionally opinions announce dicta. That is, if you will, not something that should be applied. I'm shocked. That is applied to the case, the facts of the case at issue. And so that statement has to be read in the context of the facts of Head. And in Head the court said it's not required in this case to present medical evidence. But if you say that Head stands for the proposition that it can never be required, then you have to look at Wong, which was a case decided just a month previously and also not decided, also not mentioned in Head. In the Wong case, you've got a student at the University of California, Berkeley, who has a reading difficulty, and he's applying for protection under the Americans with Disabilities Act as well. His problem is that he can read. Much like Mr. Gribben, he can do the essential functions that he is or the major life activities at issue. He just can't do them in a certain condition, manner, or duration as the average person in society can. So Mr. Wong presented evidence that he could read. In fact, if you didn't put him under any time constraints, he could read with 99.5 percent of the people in the population. But if you limited his time constraints to less, you know, and didn't put any kind of time constraints on him, then he read at an eighth grade level. And the court said he's not disabled. Why? Because they said he didn't present any comparative evidence to show that his inability to read was substantially limited as compared to other people in society. Was Wong a summary judgment case? It was. Okay. It was a summary judgment case, and it was decided for exactly this principle, that if a plaintiff does not present comparative evidence at the summary judgment stage, if he fits within that Category 2, those individuals who aren't unable, they're just substantially limited, then you are going to lose on summary judgment. Do you know when Wong and Head, when they were decided whether the CFR regulation that I quoted, was that in existence at that point? It was, Your Honor. I'm not sure why both cases ignored it. There have been actually a number of cases in the Ninth Circuit that have relied upon the 29 CFR, 1630.2. It was adopted prior to actually the Supreme Court's decision in Toyota in 2002 because the Toyota case relies upon it as well. And so those regulations, I don't have the exact date that they were adopted, but I know that they were referred to in Toyota in 2002. So that's where it comes down to. If you fit, if you apply the regulation on point, the regulation which has been applied by this Court on numerous occasions, a plaintiff's either got to fit within Category 1, which is unable to perform the major life activity at issue, or if he fits within Category 2, he's got to show that he's substantially limited as compared to the average person in society. In this case, Mr. Gribbon failed to do that. He didn't present any comparative evidence. And so Judge Martone said, I can't decide. I can't decide if his inability to work in the heat is any more significant than the average person in Arizona, because as we all know, it's brutal to work outside in the heat in Arizona. As a matter of policy, obviously some of our case law may have some divergence. I know this will come as a great shock to you. But does it not make more sense to have evidence of this nature heard at a plenary trial rather than at the summary judgment level? I'm talking about the comparative evidence that the regulation calls for. Well, the summary judgment rules serve a very important purpose, of course, in our jurisprudence. And it's not a very difficult standard for a plaintiff to come forward and say, look, I have difficulty doing this as compared to other people in society. I could present evidence from my doctor as to what other people could do. I could testify about myself. I could bring my friends in and say, here's what he could do before the onset of the condition. Here's what he could do after. It's not a difficult standard. It's clear in the regulations. It's clear in Wong that that comparative evidence is necessary. And so it's not hard to say to a plaintiff at the summary judgment phase, if you're going to prove that you are substantially limited in the second category of cases, you've got to present comparative evidence. And I gather UPS's position that despite what opposing counsel said about the testimony of Dr. Moon, I think, that there was, in fact, no comparative evidence presented by the plaintiff in this case. Is that correct? That is correct. And if you actually listen carefully to what Dr. Moon said, most people with cardiomyopathy would have these similar symptoms. That's not the test. The test is what is the average person in society able to do, not people with Grimman's limitation, but rather what's the average person in society able to do. So given that burden, a clearly enunciated burden under the regulations and clearly enunciated under Wong, it was Mr. Grimman had an obligation to present evidence that his limitations were substantially more limiting than those of other people in the general population. Failing that, he failed to carry his burden of proof on summary judgment, and the district court was correct to say, I can't rule in his favor in the absence of that evidence. Would you argue that Wong, which, based upon the volume of Fed Third it went into, was decided before Head, that Head, in fact, conflicted with an earlier Ninth Circuit precedent? Well, I would say this. If read, if Wong is read, excuse me, if Head is read broadly to say that it is error to require comparative evidence, then yes, I would say that Wong and Head are in conflict. But I think that reading of Head is too broad. I think the proper reading of Head is to say there are some cases where the disability is so apparent or so obvious or so significant that comparative evidence is not required. So you distinguish it based upon the facts, which, of course, is a perfectly logical approach. That is exactly my statement. That is exactly my statement. Now, of course, Head argues that the district court erred by requiring medical and medical evidence to substantiate the substantial impairment of major life activities at the summary judgment stage. We agree in reverse and remand as to this issue. That sounds like error to me. I mean, Head's a problem. I don't know. There's no doubt that Head's a problem. It's a strange. I think the district court did not properly limit Head to its facts. It stands in stark contrast to the decision of Wong just a month earlier, to the EEOC regulations on point, the plain language of those EEOC regulations, to the decisions from, as we've cited in our cases, from six other circuits around the country. It's the blunderbuss statement that comparative evidence is not required is simply in contrast to the solid principle of law that when you fit within that category two case, where you're able to do the major life activity at issue, but just not the way other people can, you've got to show what other people can do. And, again, Head, you feel, was decided the way it was because of the nature of this man's problem. He was bipolar. He really couldn't sleep, couldn't do all those other things where, I don't know whether he could take judicial notice, but it was just common sense that most people didn't have that issue. Is that what you're saying? What I'm saying is, yes, if you look at Head and you compare, if you overlay the regulations on top of Head and on top of Wong, which neither court did, but if you were to overlay the regulations on top of him, Head was a category one case. He was unable to do these major life activities, thinking, sleeping, interacting with others. He couldn't do them. On the other hand, on Wong, he could. And so in Wong, the Court said, okay, you're not a category one plaintiff. You're a category two plaintiff. You can do the major life activities at issue. You simply have to prove now that other people who, without that limitation, can do them without limitation. You've got to present the comparative evidence. And so that's where I think the distinctions happen. These two cases came out roughly the same time. Neither of them really considered the regulatory framework. If they had, I think the courts would have found that Head was a category one case where comparative evidence is not required, whereas Wong was a category two case where that's where we come out on that. Turning very quickly to one other issue that I think is important. I don't think this Court should be confused about the evidentiary issues that the plaintiff cites. And I want to address the 100 percent fit-for-duty claim. First, let me make it clear. Our position is this is an evidentiary issue. This is not the judge didn't enter summary judgment when he ruled in response to our motion in limine that Griffin would not be allowed to present evidence of this alleged 100 percent fit-for-duty claim. That is, it is an evidentiary issue that should be reviewed on an abuse of discretion standard. Just to kind of summarize how it came up. Mr. Griffin's claim, his lawsuit, alleged basically two claims, a discrimination claim and a retaliation claim. In his complaint, with regard to the retaliation claim, he was very clear. He listed four things that UPS did to discriminate against him. And that was in paragraph 25 of his complaint. One of them was not requiring him to be 100 percent fit-for-duty, which is the evidence he later attempted to produce. And his discrimination claim, however, did allege that in discriminating against him, UPS required him to be 100 percent fit-for-duty. And he argued that that requirement was contrary to UPS's policies, thus showing that it was pretext for discrimination, which, of course, is an important element of a discrimination claim. UPS moved for summary judgment on all of Mr. Griffin's claims. And the Court considered all of the evidence that Mr. Griffin supported in support of his claims. And again, in his response to UPS's global motion for summary judgment, Mr. Griffin supported throughout his 100 percent fit-for-duty claim in support of his discrimination claim, not in support of his retaliation claim. So then, of course, when the Court decided the motion for summary judgment, it examined the evidence Mr. Griffin had cited. And, of course, the local rules require that you produce all the evidence you have in support of your various claims. It decided that based on the evidence Mr. Griffin had cited, he did not prove his discrimination claim, and it dismissed that claim. It then allowed him to go to trial on the retaliation claim. On the eve of trial, then, on the eve of trial, Mr. Griffin puts in the final pretrial management order evidence that he wants to introduce, and it is evidence concerning this 100 percent fit-for-duty claim. And UPS objected and said that claim has been decided. That evidence should not be admitted. And the Court agreed and said, I have decided this issue. We've had a motion for summary judgment on it. We've decided you're not disabled. The evidence of your 100 percent fit-for-duty pretext claim, that pretext argument, is not going to come in because it doesn't support and isn't relevant to and has not been pled in support of the retaliation claim. It was an evidentiary ruling. So this Court needs to review that on an abuse of discretion standard, and we would submit that the Court did not abuse its discretion in deciding to exclude that evidence. The same is true for the remainder of the retaliation issues, or the remainder of the evidentiary issues cited by the Court. The Court has broad discretion to require that proper disclosures be made, that witnesses be disclosed if they're going to be fact witnesses and they're going to support the evidence of the case, that they be disclosed properly. Mr. Rahill is a good example. Mr. Rahill was not disclosed as a fact witness. There was no indication again until the final pretrial order that Mr. Rahill was going to provide any testimony in support of Mr. Gribben's case in chief. But when he was finally offered, allegedly in rebuttal, the Court examined the plaintiff's counsel as to why he was being offered. And the Court concluded that Mr. Rahill's testimony, which was going to be, apparently, that he had told or that somebody had told him, that somebody had told somebody else, that Jerry Dalzell knew. At the time he made the decision to terminate Mr. Gribben, he knew about those EEOC determination letters. The Court said that goes right to the heart of the claim, which is that Jerry Dalzell was acting in response to those determination letters. It's not just impeachment evidence. It's not offered solely for impeachment. It goes to the heart of the matter. And if that's the case, you should have disclosed Mr. Rahill as a fact witness prior to this time. So the Court, again, did not abuse its discretion in excluding that testimony. Was there any prejudice to the plaintiff's case by the exclusion of that? There should not have been, because if the plaintiff needed that evidence to prepare or present his case, he should have disclosed it. The plaintiff was able to put on evidence that he believed supported the conclusion that somehow UPS had retaliated against him in response to those determinations. If he believed Mr. Rahill was an important additional witness to that fact, Mr. Rahill should have been disclosed. So it's hard to know if there was prejudice or not. But if there was prejudice, it was only because of the lack of disclosure. Had the person whose testimony was supposedly being rebutted denied knowing about the charge? Did – I'm sorry. I'm not sure I understood the question. Well, was there an impeaching factor? That's what I'm – The – whether the – was there an impeaching factor, I would have to say that, yes, in some degree, the evidence may have been viewed as partially impeaching. But as the Court pointed out in reviewing the evidence and deciding it, the test is solely for impeachment. And the Court said that this evidence goes right to the heart of the issue, which is that, in fact, the witness who testified for UPS and said, I didn't know about the determination at the time I made the decision to terminate him, when this new   And so the evidence that you did, because somebody told somebody who told somebody that you did, that evidence, if that's going to be introduced, has got to be disclosed. That's – now, that's not – had the – did the witness testify that he knew about the charge? No, Mr. – You're just talking about the fact that the EEOC did something with it. Oh, he knew about the charge, yes. He did not know about the – I have to take that back, Your Honor. I'm not certain if he had testified that he knew about the charge. What Mr. Dalzell has testified to is that he was not aware of the determination, the EEOC determination, at the time he made the termination decision. Thank you, Mr. Barton, for your presentation. We'll hear, finally, the rebuttal argument from Mr. Bunnett. Thank you, Your Honor. Thank you, Your Honor. I'd like to first address the last point. I think the confusion that may exist over this point is that the judge, trial court judge, found that because the evidence had a substantive value to it, that's why it should have been disclosed. And, in fact, I don't think it's in dispute that it was disclosed. It just wasn't disclosed with the formality that Rule 26 required. But they knew about it. And they knew what Mr. Rahill had said because Mr. Rahill had typed up a statement about what Mr. Stephens had said. And their attorneys were present. But I think the Halbash case that we cite in our brief is really a good read out of the District of Oregon on this analysis and why, because of what we were intending to use this specific piece of evidence for, was to impeach not only Jerry Dalzell, the decision-maker, but also Denise Ecker, the HR person, because they both denied that they had told one another that this communication had taken place about the knowledge of the existence of the EEOC letter when the time that the decision was made to terminate Mr. Gribben. And not only what our point that we raised in the brief was not only would that have impeached them on this issue of that fact, but it could have impeached their entire credibility. A jury could have very well concluded that, look, if they're not being truthful about this, they aren't being truthful about anything that they've testified to here in this case. Why would the letter add much to a retaliation case if the witness knew about the charge pending and just didn't know that the EEOC had issued some sort of a letter? On the facts of this case, Your Honor, we think it's very important because it was within a matter of days after the EEOC issued a favorable determination letter to Mr. Gribben that he was denied the use of an air-conditioned cab that they had been providing to him for a year. So it's the timing or the temporal proximity of their knowledge of that letter that we think the trier of fact could have concluded triggered the act of termination. Finally, I'd just like to respond to the question that was raised on the Wong matter. I think the facts, as I read Wong, dealt with a somewhat different issue that was that there was no impairment that or that there was no substantial limitation because Mr. Wong had advanced well, well into the formal educational process. And I think if you compare the facts of that case with what is stated in Head, and Head cites two other cases, by the way, McAlinden v. County of San Diego and Frazier. So we have three different instances where comparative evidence was not required. And I think it isn't just the Court reaching out in Head and coming up with this result. I think it was echoing earlier a sentiment out of this circuit that a comparative is not required. Very good. Thank you. Thank you both for your arguments. Very helpful. The case of Gribben v. UPS is submitted, and the Court will stand adjourned.
judges: Canby, Thompson, Smith